SMITH *v.* THE SECURITY BANK & TRUST COMPANY.

4-5139

Opinion delivered July 4, 1938.

*Cecil Grooms* and *W. W. Bandy,* for appellants.
*Rhine & Rhine,* for appellee.

DONHAM, J. Harry Kupper, doing business under the trade name of Paragould Auction Sales & Commission Company, engaged in selling cattle at auction during the year 1936 at Paragould, Arkansas. Persons having cattle for sale would carry them to Paragould and turn them over to Kupper for sale at auction, paying him 4 per cent. of the sales price as commission for his services. The sales were held once each week and continued practically throughout the year of 1936.

Kupper carried an account in the trade name with the appellee, The Security Bank & Trust Company. He had an arrangement with appellee, whereby he would deposit on each auction sales day the amount of money he received as the purchase price of the cattle he sold at auction. He had an agreement with appellee, whereby

appellee agreed to cash all checks drawn on said account and made payable to the owners of the cattle sold at auction. These checks represented the full sales price of the cattle, less 4 per cent., said 4 per cent. being the commission deducted by Kupper for his services in selling the cattle.

As stated, these auction sales continued during the year 1936 until the latter part of December. A few days prior to December 30th at a conference between Kupper's representative and the officials of the bank, it was ascertained that Kupper, because of his own private transactions, had become indebted to different persons in the sum of $1,800, for which he had drawn checks on the account carried with the bank in the name of said Paragould Auction Sales & Commission Company. At the time of this conference, there was a balance of only $280 on deposit in the bank to the credit of said account. At the time of said conference, the bank agreed to loan Kupper $500 and did loan him this amount, taking his personal note for same. The last auction sale was to be held on December 30th. At the time of this conference, it was agreed between the bank and Kupper that whatever Kupper owed the bank should be paid out of the funds arising from the last auction sale. Between the time of the conference and the day following the auction sale, the bank cashed $1,020 of the personal checks of Kupper, issued and dated several days prior to the date of said last auction sale. The amount of money received by Kupper for the sale of stock at said auction sale on December 30, 1936, was $3,400. He carried said amount to the appellee, bank, and deposited same in the account carried in the name of Paragould Auction Sales & Commission Company. When this was done, the bank appropriated a sufficient amount of said account to pay its $500 note and the $1,020 which it had paid out on the checks given by Kupper in the transaction of its private business. This was in accordance with the agreement had with Kupper a few days prior to the last auction sale. The bank knew all along that the funds being deposited in this account were funds derived from the sale of cattle which did not belong to Kupper, but which he sold at auction for others.

The bank, throughout the time said auction sales company had been doing business, had cashed all the checks that said company had drawn on its account in payment of the amounts due the owners of the cattle which said auction sales company had sold. As stated, it knew all along that the funds deposited in said account were trust funds, that is, that they were funds which had been derived from the sale of the property of others sold at auction. Furthermore, it knew that the $3,400 deposited to the credit of said account, being the last deposit made to said account, were funds derived from the sale of cattle and that said cattle did not belong to Kupper, but that he, under his trade name, had sold same for others, charging a commission of 4 per cent. therefor.

It is true that the payment of the note and the amount due the bank for having taken up these personal checks of Kupper to the extent of $1,020 was in accord with the agreement which Kupper had with the bank several days prior to the date of the last auction sale. But, the question here is, did the bank and Kupper have any right to make such agreement with reference to the funds arising from the auction sale, both knowing that the funds did not belong to Kupper, but were trust funds arising from the sale of cattle owned by others? When the cattle were sold, the practice was to give the owners of the cattle checks drawn by Kupper on the account carried in the name of his auction sales company, instead of paying them in cash. Parties to whom the checks were given would then go to the appellee bank and cash their checks. The owners of all stock sold at auction on December 30th were given these checks for the price at which their cattle sold, less 4 per cent. Some of them did not go to the bank immediately to cash their checks; and when, a few days later, they presented their checks at the bank they were turned down, the bank having appropriated in the meantime a sufficient amount of the last deposit of said auction sales company to pay the $500 note due it and $1,020 which had been used to take up the personal checks of Kupper issued and dated several days prior to the date of said last deposit.

Those whose checks were not paid and who have brought the suit resulting in this appeal held checks in the sum of $1,080. Suit was filed in the Greene circuit court for this amount. The court, sitting as a jury, made certain findings of fact. Said findings of fact are here set out in full:

"1. Harry Kupper, under the trade name of the Paragould Auction Sales & Commission Company, in the latter part of 1935, opened in Paragould an auction sale business, selling at auction for cash livestock and other property brought to him by his patrons generally receiving as compensation 4 per cent. of the proceeds of such sale.

"2. In the early part of 1936 he opened an account with the defendant bank under said trade name, which account was closed on the 31st of December, 1936.

"3. During the life of this account, Kupper, once a week on Wednesday, held an auction sale as aforesaid, such sale commencing at 10 o'clock in the forenoon and ending around six o'clock in the afternoon, and after the sale closed carried the proceeds of such sale in cash to the defendant bank. This money was left during the night of the sale in the vault of the defendant, and the next morning when the bank opened for business, said money was deposited and said auction sales company given credit therefor.

"4. There was only one account, and Kupper deposited in this account both his personal and individual funds and the funds received in his capacity as auctioneer aforesaid.

"5. On a sales day the owners of the property to be sold at auction would bring it in, turn it over to Kupper to be auctioned off, and each would receive a check on defendant bank for the net proceeds of the property sold, this being the sum remaining after deducting the 4 per cent. due the auctioneer.

"6. There was an agreement between Kupper and the defendant that all such purchase price checks presented on the day of sale would be paid by the defendant bank on presentation.

"7. The defendant knew that the auction sale day was on Wednesday each week.

"8. The auction sale always made money, and Kupper got in debt and went into the red at defendant bank only after he began to speculate on his own hook in buying and selling livestock.

"9. In buying and selling livestock on his own hook, in payment of such purchases he gave checks to the owners on defendant bank for the purchase price, and these checks were taken care of by the defendant.

"10. After Kupper began giving these checks for livestock purchased by him individually he drew checks on defendant largely in excess of funds in the defendant bank to his credit and on Saturday or Monday prior to the weekly auction sales on Wednesday, John Hitchcock, his bookkeeper and the main witness in this case for plaintiffs, would confer with defendant and make arrangements for taking care of these checks.

"11. On Saturday or Monday prior to the December 23rd, a week before the last auction sale day which was December 30th and the one in question here, said bookkeeper Hitchcock, borrowed $1,000 from defendant here, giving a note signed by Kupper for the amount, to take care of these checks so drawn in excess of his credit on account in defendant bank.

"12. On Saturday or Monday just prior to the following sales day, Wednesday, December 30, the day plaintiffs' property was sold and the proceeds thereof deposited in defendant bank to recover which this suit was commenced, Hitchcock and defendant again conferred concerning Kupper's outstanding checks drawn as aforesaid. At this conference it was found that Kupper had a balance to his credit in the defendant bank in the sum of $280, and that his outstanding checks aforesaid amounted to $1,800. Again Hitchcock, for Kupper, borrowed $500 from defendant, giving therefor his note for that sum. This, together with the said credit, created a fund of $780 to take care of said outstanding checks, leaving a balance of such checks in the sum of $1,020 unprovided for in so far as having money in the bank with which to honor them when presented for payment.

"13. At this last meeting of Hitchcock and the defendant it was agreed between them that the said note for $500, and the balance of the outstanding checks ($1,020) were to be taken up and paid out of the proceeds of the next auction sale day which was December 30, and that these items were so taken up and paid.

"14. Hitchcock testified that while there was no express understanding that defendant was to pay these outstanding checks drawn as aforesaid, still the defendant did in fact take care of them, and this was not denied. This refers to any general agreement and not to special agreement as in No. 13.

"15. The proceeds of the auction sale on December 30 was $3,400 and represented partly money received from the sale of some livestock belonging to Kupper individually and partly money belonging to patrons, including these plaintiffs. The proceeds of the sale on December 23rd preceding the last sale on December 30th was $2,600 and included no individual money belonging to Kupper except probably his 4 per cent. commission. Said $3,400 was deposited to Kupper's credit in said bank on December 31, 1936.

"16. No other deposit was made by Kupper in defendant bank other than said $3,400 between the Saturday or Monday that said $500 was borrowed by Kupper from defendant just prior to the last sale day, December 30th, and December 31, the day the said account was closed.

"17. All checks given owners of property sold December 30, 1936, by Kupper which were presented to defendant for payment on that date were paid and some presented the next day, December 31, were also paid by defendant.

"18. The books of the Paragould Auction Sales & Commission Company kept by Hitchcock for Kupper showed the name of every person that delivered to Kupper property for sale on December 30, and which were sold on that date, and the exact amount of every check issued to each one of such property owners, and that he would have furnished defendant bank this information

if it had asked him for it. Kupper's business office was in Paragould and known to defendant.

"19. The final statement furnished Kupper by the defendant showed payment of Kupper's debts on December 31 in the sum of $2,100 and a balance of $2.80 in his favor.

"20. The defendant knew that the last said deposit of $3,400 was composed partly of the proceeds of property owned by persons who delivered it to Kupper for sale on said December 30, and partly of the proceeds of property so sold owned by Kupper, together with his commission of 4 per cent.

"21. $800 of these outstanding checks came in and were paid by defendant on or prior to the said date of the said last deposit.

"22. There was an agreement between defendant and Kupper that all checks issued by him to his patrons for the purchase price of property sold by him as auctioneer as aforesaid if presented on the weekly sales day would be paid by defendant.

"23. On the night of each weekly sales day the proceeds of the property sold on that day was carried by Kupper, or rather by his bookkeeper, Hitchcock, delivered to an agent of defendant and placed in defendant's bank vault, and credit given the Paragould Auction Sales & Commission Company the next morning. This was the way the proceeds of the last sales day were handled.

"24. At the weekly meetings of Hitchcock, as bookkeeper of Kupper, on Saturday or Monday prior to the following Wednesday sales day, and defendant, the outstanding drafts drawn by Kupper on defendant, the list of which was kept by said bookkeeper, were discussed between them and a sum satisfactory to defendant would be loaned by defendant to Kupper to take care of such drafts, but this loan never covered the entire amount of such outstanding drafts. Kupper gave the defendants his personal note, unsecured, for the amount of the loan. This note, prior to the sale on the 23rd of December, 1936, was $1,000, and prior to the last sale on December 30, 1936, was $500, but the note in neither case covered the entire outstanding checks. In each case, however, it was

understood between them that all of these outstanding checks should be and were paid out of the proceeds of the auction sale held on the Wednesday following this understanding in each case.

"25. When Kupper's account was overdrawn defendant called the bookkeeper in and arrangements were made 'satisfactory' to the bank.

"26. The payment of the said $500 note to the defendant bank was paid out of the proceeds of the last auction sale simply by charging it to Kupper's account. No check was drawn by Kupper payable to the bank covering this personal indebtedness to the bank.

"27. At the said last conference between Kupper and defendant, defendant knew these outstanding checks were out and Hitchcock testified that they bore the date of their issuance.

"28. Defendant closed Kupper's account December 31, 1936, and refused to further credit Kupper, although asked to do so by Kupper.

"29. Kupper took bankruptcy in a few days after defendant refused further to carry him and give him credit."

The propositions which the record presents for the court's consideration may be appropriately stated as follows:

(1) Was the payment to itself by appellee of the $500 note of Kupper a conversion to its own use of that amount of the $3,400 deposit, said deposit being proceeds of the sale of the cattle sold at auction on December 30, 1936?

(2) Was the appropriation by appellee of $1,020 of said $3,400 deposit in payment of the personal checks of Kupper, or in payment to the bank for having taken up that amount of the personal checks of Kupper, a conversion of that amount of said deposit?

*Central National Bank* v. *Com. Mutual Life Insurance Company,* 104 U. S. 54, 26 L. Ed. 693, is a case in point. In this case a general agent of the insurance company opened an account in a bank as general agent. He mixed his personal funds with those of the insurance company. Checks drawn on the account were signed by

the agent as such. The bank knew that the party opening the account was the agent of the insurance company. The bank paid itself an overdue private note of the agent, without a check from the agent, out of the funds which had been deposited to his account as agent. After stating the rule governing the payment of checks drawn on general deposits, the court said: "But when against a bank account, designated as one kept by the depositor in a fiduciary character, the bank seeks to assert its lien as a banker for a personal obligation of the depositor, known to have been contracted for his private benefit, it must be held as having notice that the funds represented by the account is not the individual property of the depositor, if it is shown to consist, in whole or in part, of funds held by him in a trust relation."

In the case of *Carroll County Bank* v. *Rhodes,* 69 Ark. 43, 63 S. W. 68, the bank honored a check drawn on a trust fund by the trustee in payment of his own individual debt. The court, after stating the rule applying when checks are properly drawn on a general account and presented for payment, stated: "But there is an exception to this rule. If the bank has notice that the fund does not belong to the depositor, and the check is drawn to pay a debt due the bank then the banker would be effected with a knowledge of the unlawful intent, and would be in duty bound to dishonor the check, and, if he did not do so, would be a participant in the profits of the fraud and liable, to the owner of the fund for all moneys appropriated to the payment." Citing, *Boone County Bank* v. *Byrum,* 68 Ark. 71, 56 S. W. 532.

In the case of *American Surety Co.* v. *Vann,* 135 Ark. 291, 205 S. W. 646, this court said: "This cause is ruled by the opinions in the cases of *Carroll County Bank* v. *Rhodes,* 69 Ark. 43, 63 S. W. 68, and *Boone County Bank* v. *Byrum,* 68 Ark. 71, 56 S. W. 532. It was held in those cases that a surety who pays a sum of money for his principal is subrogated to the rights of the beneficiary to maintain an action for the money so paid. Those cases are also to the effect that one who receives trust funds from a trustee with knowledge of the fact that the trustee has wrongfully converted these funds to his own

use becomes liable therefor to the beneficiary of the trust. Under the allegations of the complaint Vann & Sons became parties to the conversion of these trust funds, and were liable to the minors for the sum so received, who could have maintained an action therefor."

In the case of *Walker* v. *Rose,* 153 Ark. 599, 241 S. W. 19, quoting from the third headnote thereto, this court held: "Testimony that the officers of a bank knew that landlord had a lien on his tenant's crop, and directed the tenant to sell his cotton in another state, credited drafts drawn on the purchaser to the tenant's account, and accepted from him checks on that account for the satisfaction of his indebtedness to the bank, held to show a conversion of the proceeds of the cotton to the bank's own use, rendering the bank liable to the landlord for the amount so converted."

In the case of *Oklahoma State Bank* v. *Galion Iron Works & Manufacturing Co.,* 4 Fed. 2d 337, the Eighth Circuit Court of Appeals held: "That an agent may not deposit funds collected by him for his principal with a bank to his own individual credit, and draw them for his own personal and private use, in the absence of authority from his principal is well settled, and when a bank with knowledge that its funds belong to the principal and not the agent, which was apparent from the face of the warrants, permits him to do so, it is liable to the principal for the moneys, thus deposited and withdrawn by the agent on his individual check and by him converted to his own use."

It is unquestionably the law that a general deposit of money in a bank passes the title to the bank and establishes the relation of debtor and creditor between the bank and the depositor, and because of this relation the bank is bound by contract to honor the checks of the depositor to the extent of the deposits and becomes liable if it refuses to do so. No principle of law is better established. *Darragh Co.* v. *Goodman,* 124 Ark. 532, 187 S. W. 673; *England* v. *Hughes,* 141 Ark. 235, 217 S. W. 13; *Bank of Hatfield* v. *Chatham,* 160 Ark. 530, 255 S. W. 31. However, there is an exception to this rule, that exception being that if the bank has notice that the funds

deposited do not belong to the depositor, it must dishonor a check drawn by the depositor on the account in payment of his individual debts. If it does honor such checks with knowledge that the funds belong to others than the depositor, it becomes liable to the rightful owner of the funds. Neither can the bank appropriate such funds in payment of a debt owing by the depositor to it. In other words, the usual right to set off as against an overdue note of the depositor so much of the deposit as is required to discharge the note does not exist.

The appellee bank in the instant case knew when it had the agreement with the representative of the Paragould Auction Sales & Commission Company to appropriate enough of the funds arising from the auction sale which was to take place within a few days thereafter, to pay debts due the bank that these funds did not belong to Kupper, the debtor, and it had no right to enter into such an agreement. It knew all along during the time Kupper, doing business as Paragould Auction Sales & Commission Company, had been selling cattle at auction, that the funds arising from the sales did not belong to Kupper, the auctioneer. These were the funds of the owners of the cattle sold at auction. Therefore, Kupper and the bank had no lawful right to make an agreement to appropriate the funds in payment of Kupper's individual debt to the bank. When such an agreement was made and actually carried out, both Kupper and the bank became liable on the theory of an unlawful conversion of the funds.

It follows from what we have said that the judgment of the court in favor of appellee is erroneous and must be reversed, and the cause remanded with directions to render judgment in favor of the appellants in the total sum of $1,080, to be proportioned to each of the appellants in accordance with the respective interest of each as shown by the record herein, together with interest at the rate of 6 per cent. per annum from December 31, 1936, to date of judgment, and for costs of suit. It is so ordered.

Mr. Justice McHANEY, disqualified and not participating.