In re BRITTENUM & ASSOCIATES, INC., Plaintiff, Debtor.

James F. DOWDEN, Trustee,

v.

CROSS COUNTY BANK; Jon R. Brittenum; Jana D. Brittenum; Melvyn L. Bell; Fred E. Halstead; Jerry Halstead; and Diana Halstead Jones, Defendants.

No. LR–C–87–732.

United States District Court, E.D. Arkansas, W.D.

Feb. 26, 1988.

 

Robert R. Ross, Arnold, Grobmyer & Haley, Little Rock, Ark., for James F. Dowden, trustee for Brittenum & Associates, Inc.

Ken Cook, Ivester, Henry, Skinner and Camp, Little Rock, Ark., for Cross County Bank.

## ORDER

ROY, District Judge.

This is an appeal by the Cross County Bank (Bank) from the August 27, 1987 Order of the United States Bankruptcy Court, Eastern District of Arkansas, Western Division, finding, *inter alia,* that the certificate of deposit number 9545 and savings account 01–494852–10 are property of the estate free and clear of any claim of lien or right of setoff by the Bank. The parties have filed their briefs and this matter is ripe for determination.

In June of 1986, James A. Dowden, the duly appointed Trustee of Jon R. Brittenum and Associates ("Trustee"), commenced a turnover action against the Bank. The Trustee requested that the bank be ordered to deliver to the Trustee all funds and securities of Jon R. Brittenum and Associates ("B & A") held by the Bank. The Bank resisted the Trustee's request claiming that the B & A assets sought by the Trustee are collateral for a loan from the Bank to B & A.

The Bank claims that it is entitled to recover from its collateral $300,000.00 plus interest and attorney's fees as a result of a default of B & A in the repayment of a $300,000.00 loan made to it by the Bank. The loan was secured by B & A's pledge of a certificate of deposit in the principal amount of $300,000.00 made payable to Jon R. Brittenum and Associates, Inc., Special Reserve Account For The Exclusive Benefit of Customers. As additional collateral, the Bank claims it has a right to set-off against a savings account established at the Bank in the name of Jon R. Brittenum and Associates, Inc. Special Reserve Account For The Exclusive Benefit of Customers which, on the date of the bankruptcy filing, had a balance of $373,000.00.

The Trustee contends that the pledge of the certificate of deposit by B & A was invalid and is unenforceable because it is a special reserve account under Rule 15(c) 3–3(f) of the Rules of the Securities and Exchange Commission, 17 C.F.R. § 240.15c 3–3(f) (1987). The Trustee also claims that the savings account is a special reserve account and, therefore, the Bank cannot

exercise its otherwise enforceable right to set-off.

The Bank claims that neither the certificate of deposit nor the savings account are special reserve accounts because B & A failed to contract with the Bank that the Bank would not accept these accounts as collateral as is required by Rule 15(c) 3–3(f) of Rules of the Securities and Exchange Commission. In the alternative, the Bank claims that if a contract existed, it was modified or rescinded, resulting in the loss of the special reserve status for both the certificate of deposit and the savings account.

The Trustee contends that no written contract is required by Rule 15(c) 3–3(f) as claimed by the Bank. However, the Trustee asserts that if a contract is required, they exist in the form of two letters signed by Ken McClanahan, the Bank's President. The Bank contends that these letters were executed under false pretenses to simply satisfy a request for audit information made by B & A and for numerous legal and factual reasons do not constitute contracts.

The Bankruptcy Court specifically found that the letters signed by the Bank's President satisfied the notification requirements of the Rule. The Bankruptcy Court made no specific finding that a contract was required by Rule 15(c) but found the Bank reached an agreement with B & A to hold the funds in accordance with the requirements of Rule 15(c) 3–3(f). The Bankruptcy Court held that both the certificate of deposit and the savings account were special reserve accounts under Rule 15(c) 3–3(f) at the commencement of the liquidation proceedings and thus the Bank was prohibited from treating them as collateral for purposes of satisfying the loan which was in default.

It is from this ruling that the Bank appeals.

With a few minor corrections, the parties agree to the relevant facts. Therefore, the Court need not concern itself with a review of any factual findings of the bankruptcy court, for only legal issues are involved. The bankruptcy court's conclusions of law are subject to *de novo* review. *In re Com-er*, 723 F.2d 737 (9th Cir.1984). Accordingly, this Court will make an independent determination of the legal issues presented.

The Bank has raised three issues on appeal: (1) Does Rule 15(c) 3–3(f) of the Securities and Exchange Commission require a "contract" between broker/dealers and depository banks in addition to and distinguished from "notification" in order to create special reserve accounts for the exclusive benefit of customers?; (2) Did a "contract" exist between Jon R. Brittenum and Associates, Inc. and Cross County Bank which created a special reserve account for the exclusive benefit of customers in certificate of deposit No. 9945 or savings account No. 01–494852–10 which would preclude Cross County Bank from either repossessing the CD or setting-off against the savings account?; and (3) If a contract existed, was it modified or rescinded by the parties resulting in the loss of the special reserve status on the CD and on the savings account?

The Rule in question in this case is found at 17 C.F.R. § 240.15c 3–3 (1987). The specific portions of the rule which are applicable to the facts are subsection (e) and subsection (f), which provide as follows:

(e) *Special reserve bank account for the exclusive benefit of customers.* (1) Every broker or dealer shall maintain with a bank or banks at all times when deposits are required or hereinafter specified a "Special Reserve Bank Account for the Exclusive Benefit of Customers" (hereinafter referred to as the "Reserve Bank Account"), and it shall be separate from any other bank account of the broker or dealer. Such broker or dealer shall at all times maintain in such Reserve Bank Account, through deposits made therein, cash and/or qualified securities in an amount not less than the amount computed in accordance with the formula set forth in § 240.15c3–3a.

(f) *Notification of banks.* A broker or dealer required to maintain the reserve bank account prescribed by this section or who maintains a special account referred to in paragraph (k) of this section shall obtain and preserve in ac-

cordance with § 240.17a–4 written notification from each bank in which he has his reserve bank account or special account that the bank was informed that all cash and/or qualified securities deposited therein are being held by the bank for the exclusive benefit of customers of the broker or dealer in accordance with the regulations of the Commission, and are being kept separate from any other accounts maintained by the broker or dealer with the bank, and the broker or dealer shall have a *written contract* with the bank which provides that the cash and/or qualified securities shall at no time be used directly or indirectly as security for a loan to the broker or dealer by the bank and, shall be subject to no right, charge, security interest, lien, or claim of any kind in favor of the bank or any person claiming through the bank. (Emphasis added).

All parties agree there is no case law construing the term "written contract" with respect to subsection (f) of Rule 15c 3–3. The Bank contends that the language of the rule contemplates a formal contract between the depository bank and broker/dealer, and that in the present case, no such formal contract was executed. The relevant facts with respect to this issue are as follows. Ken McClanahan (McClanahan) was serving as president of the Bank at all times relevant to this proceeding. On June 22, 1982, certificate of deposit number 6620 (CD 6620) was issued by the Bank to B & A in the sum of $500,000. The maturity date of CD 6620 was June 22, 1985. On August 14, 1984, a representative of B & A added the following words to the face of CD 6620: "Special Reserve Account for the Exclusive Benefit of Customers." On August 14, 1984, subsequent to the name change made on CD 6620, McClanahan initialed the certificate. On the same date a letter signed by Harry Ware, as Vice President of B & A, was received by McClanahan, who acknowledged its receipt by signing at the bottom of the letter. The letter provided, *inter alia,* that the CD "shall at no time be used as security for a loan to the firm by the bank and shall be subject to no right charge security interest, lien, or

claim of any kind in favor of the bank or any person claiming through the bank."

In May, 1985 McClanahan was contacted by Beverly Sullivan, an employee of B & A, who requested that CD 6620 be converted to a passbook savings account because B & A needed access to the money. McClanahan advised her that if CD 6620 was converted before the maturity date, B & A would forfeit $32,000 in interest. McClanahan suggested that the bank loan B & A the face amount of CD 6620, and that B & A pledge CD 6620 as collateral and set the due date of the note on the same date as the maturity date of CD 6620. By structuring the loan in this fashion, the loan could be paid with the certificate of deposit proceeds, and B & A would not forfeit $32,000 in interest.

B & A executed a promissory note in favor of the Bank dated May 28, 1985, in the sum of $500,000, due on June 22, 1985. CD 6620 was pledged as collateral. B & A received the loan proceeds in the amount of $500,000.00.

On May 28, 1985, a savings account was opened at the Bank by B & A in the name of "Jon R. Brittenum & Associates, Inc. Special Reserve Account for the Exclusive Benefit of Customers." The savings account number was 01–494852–10 (hereinafter "Savings Account"), and the $500,000 loan proceeds were initially deposited into this account on May 28, 1985. A signature card for the Savings Account was signed by officers of B & A on the same date.

A letter dated May 28, 1985, executed by McClanahan pertaining to the Savings Account was sent to B & A. The letter contained virtually the same language that is contained in the introductory paragraph and provisions as set out in the letter dated August 14, 1984.

On June 22, 1985, CD 6620 matured in the amount of $500,000, and the proceeds were used by B & A to satisfy the promissory note executed on May 28, 1985.

On June 26, 1985, certificate of deposit number 9545 (CD 9545) in the amount of $300,000 was issued by the Bank. CD 9545 was entitled "Jon R. Brittenum & Associ-

ates, Inc. Special Reserve Account for the Exclusive Benefit of Customers." CD 9545 was purchased with funds withdrawn from the Savings Account. After the withdrawal, $200,000 of the original deposit plus accrued interest remained in the Savings Account. The only explanation provided by B & A to McClanahan of the significance of the special reserve language was that it was required by B & A's auditors. McClanahan did not inquire as to the meaning of the language.

On July 1, 1985, McClanahan, at Beverly Sullivan's request, signed a letter addressed to Brittenum, president of B & A, pertaining to CD 9545. The content of the letter was prepared by an employee of B & A and delivered to McClanahan for his signature. This letter also contained virtually the same language as that contained in the August 14, 1984 letter except there is no closing paragraph.

At the time the July 1, 1985, letter was signed by McClanahan, B & A was not indebted to the Bank, and CD 9545 was not pledged as collateral.

On January 7, 1986, Brittenum, on behalf of B & A, executed a promissory note (number 01–494852–61) payable to the Bank in the principal amount of $300,000, due on July 6, 1986. CD 9545 in the amount of $300,000 was pledged as collateral by virtue of a document entitled "Assignment of Certificate of Deposit Number 9545." The Bank also took possession of CD 9545. This loan transaction occurred at the request of B & A and was presumed by the Bank to be a proper request.

■ A letter between parties can constitute a "contract" so long as mutual obligations are imposed. *Rice v. McKinley*, 267 Ark. 659, 590 S.W.2d 305 (App.1979). Appellee concedes in its brief that the Rule does not require two separate documents to satisfy the notification and written contract requirements.

■ Donald Scott testified at the hearing that he worked as a consultant for Sweeney & Associates, for a brokerage house in New York for ten years as manager of the stock record department, manager of the institutional department, manager of the broker control, the fail control areas, and the money desk. Throughout all of the various responsibilities, he had occasion to review the records surrounding the establishment of Rule 15c3–3 accounts. At the hearing before the bankruptcy judge, Mr. Scott stated that he had never seen a formal written contract executed with the establishment of a special reserve account, but had seen documents similar to the letter executed by McClanahan used to execute evidence of such accounts. The Bank presented no evidence which controverted Mr. Scott's testimony concerning the custom within the industry with respect to Rule 15c 3–3 contracts.[1]

The Court finds that the letters in issue clearly embody the notice requirement under the Rule and constitute written contracts.

■ With respect to the second issue, the Court also finds in favor of the appellee. Appellant argues that there was no "meeting of the minds," relying primarily on the argument that McClanahan blindly accepted the explanations given him by representatives of B & A, and that he felt no compulsion to inquire further. The Court is not persuaded. The Court agrees with the bankruptcy judge's finding that McClanahan, as president of the Bank, had the opportunity and responsibility to learn the ramifications of the transactions in question. The letters' content was clear—the

---

1. Appellant argues that the language of the Rule is clear and unambiguous and the Court should not have resorted to extrinsic matters to determine the Rule's requirements. The language being interpreted in this case is "written contract," and the Court finds that the letter satisfied the requirement. This Court would have so found even in the absence of Mr. Scott's testimony. Nevertheless, there is persuasive authority which would allow Mr. Scott's testimony which is found in *Les–Bil, Inc. v. General Waterworks Corp.*, 256 Ark. 905, 511 S.W.2d 166 (1974):

> ... words of art or words connected with or peculiar to a particular trade, profession or occupation are to be given the signification attached to them by experts in such art or trade, profession or occupation unless it appears that they were used in a different sense.

bank was to hold the funds for the benefit of customers of the debtor and those funds were not to be used as collateral for a loan. A "meeting of the minds" is defined as an agreement reached by the parties to a contract and expressed therein, or as the equivalent of mutual assent or mutual obligation. *Rice v. McKinley, supra.* Clearly, the letters express agreements and recite mutual exchanges of obligations sufficient to meet the essentials of a contract.

As stated by appellee, there is a presumption that deposits create a debtor/creditor relationship between the bank and the depositor, and such relationship creates the possibility of a right of set-off in the bank. *Bridgeport Company, Inc. v. United States Postal Service,* 39 B.R. 118 (Bankr.E.D.Ark.1984). However, when a bank has knowledge of a third party's interest in the deposited funds, or notice of facts sufficient to impute notice to the bank concerning the true character of the deposit, the debtor/creditor relationship between the bank and depositor is altered and the bank's right of set-off is subject to the rights of the third parties. *Bridgeport Company, Inc., supra. See also Cherokee Carpet Mills, Inc. v. Worthen Bank & Trust Co.,* 261 Ark. 776, 561 S.W.2d 310 (1978); *Smith v. Security Bank & Trust Co.,* 196 Ark. 685, 119 S.W.2d 556 (1938).

Based upon the above, the Court finds that a contract existed between the Bank and B & A which created a special reserve account for the exclusive benefit of customers in CD No. 9945 and savings account No. 01–494852–10 which preclude the Bank from repossessing the CD or setting off against the savings account.

With respect to the third issue, the contract and notice required under Rule 15c3–3 may only be amended, modified or rescinded in the manner provided by the Rule. Subsection (g) states:

(g) *Withdrawals From the Reserve Bank Account.* A broker or dealer may make withdrawals from his reserve bank account if and to the extent that at the time of the withdrawal the amount remaining in the reserve bank account is not less than the amount then required

by paragraph (e) of this section. A bank may presume that any request for withdrawal from a reserve account is in conformity and compliance with this paragraph (g). . . .

This subsection allows the bank to presume that any request for a withdrawal of funds from the account is in conformity and compliance with the Rule. However, the bank has at all times committed that any funds that are held in the account cannot be hypothecated or in any manner encumbered. Access to the account may only be accomplished by withdrawal from the acount, not by encumbering the account, as was done in the present case.

Based upon the foregoing, after conducting a *de novo* review, the Court finds that the findings and conclusions entered by the Bankruptcy Judge should be, and are hereby affirmed.