**BRIDGEPORT COMPANY, INC. f/d/b/a Comex, Inc., Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE and Worthen Bank and Trust Company, N.A., Defendants.**

**No. LR 83–438F.   AP No. 83–350F.**

United States Bankruptcy Court, E.D. Arkansas, W.D.

Feb. 24, 1984.

---

John R. Buzbee, Attorney for Debtor, Little Rock, Ark., for debtor.

Markham Lester, Little Rock, Ark., for Worthen Bank & Trust, N.A.

ORDER GRANTING DEBTOR'S COMPLAINT FOR TURNOVER OF FUNDS, DENYING DEBTOR'S PETITION FOR CONTEMPT AND SETTING DEBTOR'S SUPPLEMENTAL ISSUE SEEKING AVOIDANCE OF CERTAIN PREFERENTIAL TRANSFERS FOR HEARING

ROBERT F. FUSSELL, Bankruptcy Judge.

Pending before the court is a Complaint filed by the debtor in possession in these Chapter 11 proceedings wherein the debtor asks this court for an Order directing the defendant, United States Postal Service, to immediately permit the changing of its lockbox number in order that the debtor

**120**

might begin to receive certain of its mail directly instead of through defendant, Worthen Bank and Trust Company, N.A. (Worthen). The debtor also asks for an Order directing defendant Worthen (1) to remit to the debtor estate any funds taken from said post office box from the time Worthen allegedly "froze" the accounts of the debtor; (2) cease taking any further funds from the post office box and (3) account to the debtor and court for all funds previously taken. This Complaint was filed May 6, 1983 three (3) days after the debtor filed its voluntary petition under the Bankruptcy Code.

Separate defendant Worthen timely responded to this Complaint generally denying the allegations of the Complaint. Worthen asserts that Worthen and the debtor (Bridgeport Company, Inc., f/d/b/a Comex, Inc.) entered into an Operating Agreement for Lock Box Mail Collection (Agreement) on October 20, 1981.[1] Pursu-

1. The "Operating Agreement for Lockbox Mail Collection Service" contained the following terms:

The following operating procedures will apply to the lockbox mail collection service pertaining to the commercial checking account of Comex, Inc., (hereinafter referred to as "Customer") with Worthen Bank and Trust Company, N.A. (hereinafter referred to as "Bank").
*Remittance Address.* All envelopes containing items to be processed under the lockbox plan will bear the following address only:

Comex, Inc.
P.O. Box 3912
Little Rock, Arkansas 72203

The bank will rent a post office box at the customer's expense and customer will direct payments from its clientele to said box.
*Mail Collection.* The bank shall have exclusive and unrestricted access to the lockbox which shall be emptied at frequent intervals. The removing of money, checks, or other orders for the payment of money from the lock box *shall create a bailment* and the *bailor-bailee* relationship shall continue until such items are received at the banking house of the bank and are accepted and credited to the customer's account, at which time the relationship of the customer as a depositor of the bank shall commence. The bailor-bailee relationship shall also apply to the contents removed from the lockbox other than money, checks, drafts, or other orders for the payment of money.
*Inspection of Checks.* The bank shall open the envelopes picked up from the lockbox and shall remove the contents thereof. The checks contained in the envelopes shall be inspected and handled in the following manner:
Acceptable Payee. The payee or endorsee must be Comex, Inc. or a reasonable variation thereof. If the payee is not as provided above, the check shall not be deposited. If the payee is blank, the bank shall stamp in the same of payee's company, provided the payee can be correctly determined from the accompanying papers.
DATES:
1. Missing Date. In the absence of a check date, the bank shall insert the current date with a date stamp and process the check as hereinafter provided.
2. Postdated. Checks postdated two or more working days shall not be deposited.
3. Stale Date. Checks dated six months or older shall not be deposited.
4. Amounts Differing. If a check's written and numeric amounts differ, the bank shall guarantee the amount, if the correct amount can be determined from the accompanying papers. Otherwise, the check shall not be deposited.
5. Signature Missing. If the drawer's signature is missing and the check contains no indication of the identity of the drawer, the check shall not be deposited. Otherwise, the bank shall deposit the check and affix a stamp impression requesting the drawee bank to contact drawer for authority to pay.
6. Amount Missing. Checks with missing amounts shall not be deposited.
7. Check which bear the phrase, "Payment in Full", or words of similar import will not be deposited and forwarded to customer.
*Acceptable Methods of Payment.* The bank shall recognize checks, money orders, and cash as acceptable methods of payment and shall reject payment in any other form. Customer acknowledges that numerous discrepancies may occur when remittances are made in cash, and therefore assumes all risks whatsoever with regard thereto, and agrees that bank shall have absolutely no liability whatsoever for discrepancies of remittances made in cash.
*Processing Procedures After Inspection of Checks.* Each check found to be acceptable after inspection in accordance with these operating procedures will be deposited in the customer's account. Papers accompanying each remittance will be forwarded to the customer.
*Deposits.* The bank will prepare deposits twice daily. Detail on each deposit will be delivered to the bank's Park Plaza Office by 11:30 a.m. and 3:30 p.m. daily.
For each deposit, the bank shall provide the deposit slip and a tape of all batches making up the deposit. Each deposit shall correspond

ant to the express terms of the Agreement, Worthen asserts that it removed and inspected the contents of the lockbox and deposited any money and checks contained therein to the account of Comex, Inc. at Worthen. Worthen admits that from May 3, 1983, the date the debtor filed its voluntary petition under the Bankruptcy Code, through May 18, 1983, deposits totaling $17,342.83 and representing receipts from the contents of the lockbox have been properly made by Worthen into the Comex, Inc. account. These funds remain frozen by Worthen and thus unavailable for use by the debtor. Worthen proposed, pending adjudication of the conflicting claims of the parties, to deposit in the registry of the court $17,342.83, the amount received from

May 3, through 18, 1983 through lockbox receipts and deposited in the Comex, Inc. account. Worthen also made the same proposal regarding any funds collected from the lockbox pursuant to the agreement after the May 18, 1983 date.

On May 24, 1983, the debtor/plaintiff filed a Petition for contempt wherein the debtor asserted that Worthen violated the automatic stay provisions of 11 U.S.C. § 362. The debtor specifically alleges that Worthen is holding estate funds, having applied those funds to an alleged overdraft in the debtor's account. Further, the debtor alleges that Worthen continued to receive funds through the lockbox agreement between the parties after the entering of the order for relief and has held these

to an individual total shown on the customer's statement. These deposits will be made in anticipation of major check clearing deadlines.

*Microfilm.* All deposited checks shall be microfilmed in processing sequence for reference purposes. This film shall be retained for two years at the bank. Should it become necessary, *photocopies shall be provided upon customer request within three working days* following the day of request. If the bank has been given the deposit date, deposit total and the item position on the tapes as indexing information for reference purposes.

*Check Endorsement.* The following endorsement shall be applied to each check deposited. "For Deposit Only. Comex, Inc., Account No. 8905–439–4."

*Materials Disposition.* All deposits, deposit slips and all unprocessable or rejected items shall be delivered to the customer at the following address:

Worthen's Park Plaza Branch
Markham and University

*Returned Checks.* In the event that a check deposited to the customer's account is returned unpaid because of "insufficient funds" or "uncollected funds", the bank shall redeposit the check only once. When redeposit is not possible, such as "account closed" or "payment stopped", or a check is returned unpaid a second time, the bank shall charge the account and send the check with debit advice to:

Comex, Inc.
Attn: Lyn Ferguson
500 South University, Suite A–24
Little Rock, AR 72205

*Adjustment and Correction Procedures.* Correspondence concerning day-to-day processing irregularities shall be forwarded with the appropriate deposit date, deposit total, items

above and below the listed amount in question, to:

Supervisor, Cash Management Operations
Worthen Bank and Trust Company, N.A.
P.O. Box 1681
Little Rock, Arkansas 72203

*Bank's Responsibility: Standard of Ordinary Care.* The customer agrees that the bank's responsibility to the customer under this agreement shall be limited to the exercise of ordinary care. Establishment of and substantial compliance with the procedures set forth herein by the bank shall be deemed to constitute the exercise of ordinary care; and the customer agrees that occasional unintentional deviations by the bank from the procedures set forth herein shall not be deemed a failure to exercise ordinary care in respect to the transactions in which the deviations occur. In no event shall the bank be liable to the customer for failure to follow any of the operating procedures set forth above where such failure to act is due to the occurrence of any of the following events: An act of failure to act by the customer; the bank's equipment or a power failure; strikes or lockouts; fire or casualty; riot or civil commotion; acts of God; delay in transportation; government regulation or interferences; or any event beyond the control of the bank.

*Price Schedule.* The following schedule is to be in effect for 12 months from the acceptance date of the agreement, and will be subject to revision thereafter by further agreement of the customer and the bank.

.12 per item processed
$25.00 minimum monthly fee
Accumulated fees shall be withdrawn from the depository account monthly.

*Termination.* This agreement may be terminated by either party at any time by giving 30 days prior written notice to the other party.

funds by freezing the debtor's account or applied these funds to an alleged overdraft in the debtor's account. The debtor contends that Worthen has failed and refused to turn over this property of the estate although written and oral demand has been made upon it by the debtor. The debtor asks that the court hold Worthen in contempt for violation of the automatic stay and for failure to turn over property of the estate pursuant to 11 U.S.C. § 542.

Separate defendant Worthen countered the allegations in the Petition for contempt by general denial and an assertion that it has acted only within the terms set out in the lockbox agreement between the parties.

A preliminary hearing was held August 30, 1983. After the debtor and separate defendant Worthen filed proposed findings of fact and conclusions of law the debtor was directed to file an additional brief or proposed findings of fact and conclusions of law by September 1, 1983 with a reply by separate defendant Worthen due September 15, 1983.[2]

The debtor and Worthen on August 30, 1983, agreed to the following stipulations which the court reproduces verbatim as representing not only the facts agreed to between the parties but as a recitation of the essential facts in this case upon which the court bases its final decision herein:

1. On or about October 14, 1981, Comex, Inc. (Comex) established a corporate demand deposit account No. 8905–439–4 (checking account) at Worthen. On or about July 16, 1982 Comex amended its articles of incorporation and changed its name to Bridgeport Company. Comex gave no notice of this change to Worthen, and, in fact, continued to do business with Worthen and others in the name of Comex, Inc.

2. On or about October 20, 1981, Comex, by its president, Dwight Pierce, entered into a contract with Worthen entitled "Operating Agreement for Lockbox Mail Collection Service" (lockbox agreement).

3. While the lockbox agreement does not so state, it was known to Worthen that Comex had contracted to provide billing and collection services to persons or organizations which Comex denominated its "subscribers," most of whom were health care providers. It was contemplated that the patients of the subscribers would be billed by Comex for services rendered by the subscribers, and that the patients would mail payments and a remittance slip or form to Comex at a post office box provided by Worthen pursuant to the lockbox agreement. That post office box is sometimes referred to as "the lockbox", both in the lockbox agreement and herein. The lockbox agreement provided that Comex would direct payments from its clientele (the patients of the subscribers) to the lockbox and that Worthen would have exclusive and unrestricted access to the lockbox.

4. The lockbox agreement provided that Worthen would collect, on a daily basis, the items addressed to Comex which were delivered to the post office box; that Worthen would open the items, endorse checks in the name of Comex, and prepare a deposit of the payments to the Comex checking account; and, finally, that Worthen would deliver to Comex all documents which accompanied the payments sent in by the patients, together with a copy of the deposit slip reflecting the deposit of those payments in the Comex checking account.

5. The amounts deposited in the Comex checking account by reason of the lockbox agreement accounted for a very small, if not insignificant, part of the total activity in the account. For example, during the month of February, 1983, the average daily deposits to the account totaled $842,861.85; of that only an average of $3,993.34 resulted from the lockbox arrangement.

6. Since sometime before 1983, Comex maintained a checking account at First National Bank in Little Rock (First National) and an account with Merrill Lynch, Pierce,

box number and the closing of the lockbox, the subject of the agreement between the debtor and Worthen.

Fenner and Smith's Ready Assets Trust (Merrill Lynch).

7. On April 11, 1983, after analysis of the account and the return of certain checks by First National Bank, Worthen determined that, in its opinion, a check kiting scheme was in progress.

8. In Worthen's opinion, the scheme was operated by officers and/or employees of Comex and involved deposits and withdrawals in the accounts at Worthen, First National and Merrill Lynch made when there were not, in fact, adequate funds to cover the amounts being transferred or kited among those accounts.

9. After the scheme was discovered and outstanding items had cleared or been dishonored, there were positive balances in checking accounts maintained by Comex at First National and overdrafts in the Comex accounts at Worthen and Merrill Lynch.

10. From on or about October 20, 1981 through June 14, 1983, items received at the lockbox were processed and deposited to the Comex checking account at Worthen in accordance with the terms of the lockbox agreement. Because of the large overdraft which existed in the checking account at all times on and after April 12, 1983, the deposits made pursuant to the lockbox agreement have had the effect of reducing, but not eliminating the overdraft; there has not been, at any time since April 11, 1983, a positive balance in the account. Any items received and deposited, but later returned because of insufficient funds or for other reasons, have been charged back to the account, and to that extent have increased the amount of the overdraft.

11. The first date during the 90 day period preceding the filing of Comex's bankruptcy petition on May 3, 1983 on which the amount of Worthen's claim against Comex (arising out of a note and/or overdrafts in the checking account) exceeded Worthen's debt to Comex (arising out of positive balances in the checking account) was April 12, 1983. Prior to April 12, 1983 there were positive balances in the checking account at all times; on February 1, 2, and 3, 1983, the account balances were

$179,638.19, $196,012.38, and $208,903.30, respectively. On and after 12, 1983, there were overdrafts exceeding the amounts of deposits, thus creating a situation where Worthen's claim arising out of the overdraft balance exceeded Worthen's debt to Comex caused by deposits from the lockbox.

12. The lockbox agreement provides for a termination by either party only upon thirty (30) days' written notice. Worthen received from counsel for Comex a letter dated May 15, 1983 which, while not expressly requesting termination of the agreement, strongly implied such a request, and it has been so treated by Worthen.

13. Beginning June 15, 1983, Worthen has transferred to Comex, unopened, all items addressed to Comex and delivered to the lockbox.

14. Comex has, from time to time, obtained loans and extensions of loans from Worthen. The most recent was dated June 21, 1982, in the principal amount of $336,207.28, bearing interest at the rate of 17% per annum, and payable in twelve (12) equal monthly installments of $30,800.00 each. On February 3, 1983, Comex made a monthly installment payment of $30,800.00 on the note. On May 5, 1983, Comex made an installment payment of $30,800.00 on the note; this payment consisted of several checks, one from Comex and the remainder from individual shareholders and/or directors made payable to and endorsed by Comex to Worthen. Comex failed to pay the installment due June 5, 1983, and that note is presently in default. At no time has Worthen applied any amounts deposited to the Comex checking account to Comex's indebtedness under the note. As of the dates indicated, the outstanding principal and interest on the loan were as follows:

| Date | Principal | Interest | Total |
|---|---|---|---|
| February 1, 1983 | $177,856.18 | $2,430.04 | $180,286.22 |
| February 2, 1983 | 177,856.18 | 2,514.03 | 180,370.21 |
| February 3, 1983 | 149,738.18 | (97.27) | 149,640.91 |
| April 11, 1983 | 91,833.95 | 317.28 | 92,151.23 |
| April 12, 1983 | 91,833.95 | 360.65 | 92,194.20 |

15. On May 18, 1983, attorneys for Worthen wrote the court offering to deposit into the registry of the court an amount equal to the post petition deposits to the lockbox as well as any sums which might be received at the lockbox in the future. By letter dated May 25, 1983, the court responded that a hearing was pending before the United States District Court and that a decision by Judge Overton would dispose of the issue as to the subsequent funds and who is entitled to the ownership.

The parties also submitted an agreed chart reflecting the account balance and lockbox deposits for the period April 12, 1983 through June 13, 1983. The April 12, 1983 date represents the first date on which the debtor's account reflected an overdraft creating a claim by Worthen against the debtor. The June 13, 1983 date represents the final date the debtor's account was utilized for deposits only pursuant to the lockbox agreement between the parties. At all times from April 12, 1983 onward, the debtor's account reflects a negative balance.[3]

3. The following chart was submitted with the parties' stipulations and reflects the status of debtor's Worthen account from April 12 through June 13, 1983.

| Date | A<br>Balance in Checking Account | B<br>Amount of Deposit from Lockbox | C<br>"... any amt. by which the claim of Worthen exceeded the debt owed to Comex on the date of set off" (A–B) | D<br>Any amt. which the claim of Worthen exceeded the debt owed to Comex on the first date [4–12–83] during the 90-day period when the amt. of the claim of Worthen exceeded the debt owing to Comex | E<br>Amount trustee is entitled to recover (i.e. any amount figure in column D exceeds figure in column C) |
|---|---|---|---|---|---|
| 4–12–83 | –$278,932.58 | 704.92 | 278,227.66 | 278,227.66 | –0– |
| 4–13–83 | – 721,613.38 | 3,249.20 | 718,364.18 | 278,227.66 | –0– |
| 4–14–83 | – 716,459.88 | 5,453.50 | 711,006.38 | 278,227.66 | –0– |
| 4–15–83 | – 805,370.59 | 1,394.79 | 803,975.80 | 278,227.66 | –0– |
| 4–18–83 | – 884,945.71 | 5,870.50<br>9,233.48 | 869,841.73 | 278,227.66 | –0– |
| 4–19–83 | – 882,908.03 | 2,052.68 | 880,855.35 | 278,227.66 | –0– |
| 4–20–83 | – 877,978.15 | 4,939.88 | 873,038.27 | 278,227.66 | –0– |
| 4–21–83 | – 872,895.07 | 5,191.28 | 867,703.79 | 278,227.66 | –0– |
| 4–22–83 | – 868,689.42 | 4,309.67 | 864,379.75 | 278,227.66 | –0– |
| 4–25–83 | – 861,099.81 | 4,242.51<br>3,452.30 | 853,405.00 | 278,227.66 | –0– |
| 4–26–83 | – 860,258.27 | 1,245.46 | 859,012.81 | 278,227.66 | –0– |
| 4–27–83 | – 860,258.27 | 1,574.79<br>2,206.57 | 856,476.91 | 278,227.66 | –0– |
| 4–28–83 | – 854,239.19 | 2,330.55 | 851,908.64 | 278,227.66 | –0– |
| 4–29–83 | – 852,283.11 | 613.85<br>1,631.20 | 850,038.06 | 278,227.66 | –0– |
| 5–02–83 | – 848,098.66 | 4,248.56 | 843,850.10 | 278,227.66 | –0– |
| 5–03–83 | – 846,855.79 | 1,258.87 | 845,596.92 | 278,227.66 | –0– |
| 5–04–83 | – 843,369.37 | 3,549.42 | 839,819.95 | 278,227.66 | –0– |
| 5–05–83 | – 839,344.09 | 4,025.28 | 835,318.81 | 278,227.66 | –0– |
| 5–06–83 | – 837,593.76 | 1,863.03 | 835,730.73 | 278,227.66 | –0– |
| 5–09–83 | – 836,016.39 | 1,951.09 | 834,065.30 | 278,227.66 | –0– |
| 5–10–83 | – 835,412.15 | 604.24 | 834,807.91 | 278,227.66 | –0– |
| 5–11–83 | – 835,072.59 | 471.56 | 834,601.03 | 278,227.66 | –0– |
| 5–12–83 | – 834,024.67 | 1,047.92 | 832,976.75 | 278,227.66 | –0– |
| 5–13–83 | – 833,332.48 | 702.19 | 832,630.29 | 278,227.66 | –0– |
| 5–16–83 | – 832,174.62 | 1,147.86 | 831,026.76 | 278,227.66 | –0– |
| 5–17–83 | – 831,848.50 | 326.12 | 831,522.38 | 278,227.66 | –0– |
| 5–18–83 | – 831,453.28 | 395.22 | 831,058.06 | 278,227.66 | –0– |
| 5–19–83 | – 830,890.97 | 562.31 | 830,328.66 | 278,227.66 | –0– |

On September 12, 1983, the debtor/plaintiff submitted a pleading styled "Plaintiff's Supplemental findings of Fact and Conclusions of Law." Therein the plaintiff, purporting to correct an error in its previous brief contended that it had contrary to a statement in its previous brief, owed a debt to Worthen in excess of ninety (90) days before the bankruptcy petition was filed. The debtor was referring to the June 21, 1982 loan agreement between the parties and referred to in stipulation number 14 set out above. The debtor further alleged that all monthly installment payments made by it to Worthen from February through May, 1983 are voidable preferences. The debtor contends that payments totaling $123,-200.00 should be returned to the debtor. In this supplemental pleading the debtor also contended that the daily set off of the lockbox deposits by Worthen after the first overdraft on April 12, 1983 was a debt incurred by Worthen for the purpose of obtaining a right of set off against the debtor. Finally, the debtor contended that Worthen knew that the receipts from the lockbox were "special funds" belonging to the debtor's subscribers and the bank, if it had a right of set off, such right was limited and could not be exercised against these "special funds".

Worthen responded to the debtor's supplemental findings contending that the bank did not continue to make the lockbox deposits for the purpose of obtaining a right of set off. Worthen avers that the authority cited by the debtor in support of its allegation in this regard confirms the bank's position that a set off of a checking account balance is proper as long as there is no deliberate manipulation by the creditor to incur the debt for the sole purpose of triggering a set off. Worthen's position is that the lockbox deposits were made in the ordinary course of business pursuant to the terms of a pre-bankruptcy contract which had been in force for a year and a half.

Worthen also counters the debtor's contention that the lockbox deposits were "special funds". The bank argues that the authority cited by the debtor in support of its contention, *In Re Tonyan Construction*

| Date | A<br>Balance in Checking Account | B<br>Amount of Deposit from Lockbox | C<br>"... any amt. by which the claim of Worthen exceeded the debt owed to Comex on the date of set off" (A–B) | D<br>Any amt. which the claim of Worthen exceeded the debt owed to Comex on the first date [4–12–83] during the 90-day period when the amt. of the claim of Worthen exceeded the debt owing to Comex | E<br>Amount trustee is entitled to recover (i.e., any amount figure in column D exceeds figure in column C) |
|---|---|---|---|---|---|
| 5–20–83 | – 830,549.39 | 341.58 | 830,207.81 | 278,227.66 | –0– |
| 5–23–83 | – 830,122.38 | 442.01 | 829,680.37 | 278,227.66 | –0– |
| 5–24–83 | – 829,953.23 | 117.96 | 829,784.08 | 278,227.66 | –0– |
|  |  | 51.19 |  |  |  |
| 5–25–83 | – 829,892.68 | 60.55 | 829,832.13 | 278,227.66 | –0– |
| 5–26–83 | – 829,403.85 | 503.83 | 828,900.02 | 278,227.66 | –0– |
| 5–27–83 | – 829,157.27 | 246.56 | 828,910.73 | 278,227.66 | –0– |
| 5–31–83 | – 828,931.56 | 263.23 | 828,668.33 | 278,227.66 | –0– |
| 6–01–83 | – 828,903.12 | 60.44 | 828,842.68 | 278,227.66 | –0– |
| 6–02–83 | – 828,792.30 | 110.82 | 828,681.48 | 278,227.66 | –0– |
| 6–03–83 | – 828,701.47 | 90.83 | 828,610.64 | 278,227.66 | –0– |
| 6–06–83 | – 828,402.47 | 299.00 | 828,103.47 | 278,227.66 | –0– |
| 6–07–83 | – 828,307.62 | 11.90 | 828,207.77 | 278,227.66 | –0– |
|  |  | 87.95 |  |  |  |
| 6–09–83 | – 828,157.88 | 149.74 | 828,008.14 | 278,227.66 | –0– |
| 6–10–83 | – 828,154.12 | 3.76 | 828,150.36 | 278,227.66 | –0– |
| 6–13–83 | – 827,948.73 | 205.39 | 827,743.34 | 278,227.66 | –0– |

*Co., Inc.*, 28 B.R. 714 (Bkrtcy.N.D.Ill.1983), is inapplicable to the facts in the instant case. Worthen avers that the *Tonyan* case involved a situation where the debtor/general contractor deposited funds which had been delivered to it for payment to a subcontractor. The court in that case imposed a trust on the funds for the benefit of the subcontractor. Worthen argues that the debtor in the instant case "does not seek a constructive trust for the benefit of doctors who were to be paid from "lockbox" deposits but rather seeks the funds to be returned to Comex for its own use." Worthen contends that even if the "lockbox" deposits were denominated a "special fund" from which to pay doctors who had rendered services, such designation would now be meaningless because the doctors have already been paid in full by virtue of a bankruptcy court sale of the debtor's assets.

Worthen also sought an extension of time to file a supplemental response to the debtor's supplement and this request was granted. On October 14, 1983 Worthen filed its response along with a supporting memorandum brief in support. This pleading specifically responds to the debtor's allegation in its September 12, 1983 pleading that all monthly installment payments made pursuant to a June 21, 1982 loan agreement between the parties from February through May, 1983 totaling $123,200.00 are voidable preferences and, as such, should be returned to the debtor.

Finally, the parties, on October 14, 1983 entered one additional stipulation regarding the June 21, 1983 loan agreement between the parties referred to in the August 30, 1984 stipulation number 14, supra.[4]

4. The added stipulation is as follows:

Plaintiff and defendant, by their attorneys of record, stipulate that: Comex, Inc. made installment payments on a note dated June 21, 1982 (Exhibit A) in the original principal amount of $336,207.28, including the following:

| Date | Principal | Interest |
| --- | --- | --- |
| 2–3–83 | 28,118.00 | 2,682.00 |
| 3–3–83 | 28,846.69 | 1,953.31 |
| 4–5–83 | 29,057.54 | 1,742.46 |
| 5–5–83 | 29,485.30 | 1,314.70 |

The Note is reproduced as follows:

Upon a review of all the files and pleadings, as well as the stipulations, briefs and exhibits submitted by the parties, the court finds that the debtor's complaint for turnover of accounts receivable should be granted, its petition for contempt denied and the supplemental issue seeking avoidance of certain preferential transfers unrelated to the turnover request set for subsequent hearing. The court bases its decision on the following factors.

The debtor, pursuant to § 542(a) of the Bankruptcy Code, filed a complaint seeking to recover accounts receivable, deposited both pre- and post-petition to its account at Worthen. The debtor also alleges that Worthen should be found in contempt of court for exercising its right of set off post petition in violation of the automatic stay. Worthen is asserting its right under § 542(b) to deduct the amount it may set off under § 553 of the Code and asks the court to sanction its right of set off. Worthen seeks approval of not only the pre-petition exercise of its right of set off but post petition also. Worthen does not specifically seek relief from the stay in order that it might exercise its right of set off against post petition deposits.

In general, set offs in bankruptcy are allowed to the extent that they are based upon mutual obligations existing between the debtor and a creditor. The rationale for permitting set offs in bankruptcy is based on a concept of fairness. The creditor should not be forced to relinguish

The undersigned execute this note as makers for value and it is hereby agreed that on the non-payment as and when they respectively become payable of this obligation or any other obligations of any of the undersigned, heretofore or hereafter incurred, whether joint or several, primary or secured is absolute or contingent in the form of a bill, note acceptance endorsement guaranty, surety overdraft open account, or otherwise to said Bank, either as original obligee or as transferee thereof or incurred to or acquired by, it at any time prior to the payment of the principal and interest of this obligation in full or any installment of interest upon this or any of said other obligations, the said Bank or its assigns of this obligation may sell all or any part of the said collaterals at public or private sale for cash or on credit as a whole or in parcels in any place in the said city of Little Rock, or as said Bank or its assigns, may determine without prior notice to or demand of any of the parties hereto and in the instance of such public sale without further advertisment than one insertion not less than two days before such sale, in any newspaper regularly published in said City. The said Bank or assigns may at any such public sale purchase all or any part of said collaterals. After deducting all costs of such public or private sale the balance of the proceeds or credit thereof shall be applied upon the principal and interest of this and on any other obligations heretofore or hereafter incurred whether all thereof are then due or not, owing to said Bank, or assigns, by us or any of us, in such order manner and proportions as the said Bank or assigns may elect

If the collateral hereby pledged shall consist of shares of stock in a corporation said Bank or its assigns is hereby authorized to cause said shares to be transfered into its own name for into the name of any nominee selected by it as pledgee trustee or otherwise and shall be entitled (in addition to the rights and privileges otherwise granted to it hereunder) to exercise all rights and privileges in connection with the shares by virtue of being the holder thereof of record including voting or other powers, and whether or not it is the holder of record, to receive all cash dividends paid on the pledged shares and all additional shares hereafter issued by way of stock dividend split or otherwise, in connection with the shares pledged hereunder. All such dividends received shall be and become a part of the security held by said Bank hereunder. Said Bank, or its assigns may accept and receipt for any cash dividends on the pledged shares or any additional shares issued in connection therewith and, when deemed by it necessary may cancel and surrender the certificates covering the pledged shares in order to receive such additional shares. In case the right to purchase new or additional stock shall accrue to the benefit of said shares said Bank shall not be obligated to exercise such right of purchase, but may sell or otherwise dispose of its rights in respect thereto (regardless of any default by the undersigned), if such rights be transferable, and hold the proceeds as a part of said security

The said collaterals may from time to time, by consent of the undersigned and said Bank or assigns be exchanged for others, which shall be held under the same terms and conditions. The undersigned and endorsers hereon agree to give to said Bank, or assigns, such additional collaterals as it, or they, may at any time demand. If such additional collateral shall not be given within twenty four hours after demand therefor, or in the event of an application for the appointment of a receiver for the undersigned, or any party hereto or the filing of a petition in bankruptcy by or against, or the making of a general assignment by the undersigned, or any guarantor or endorser of this note, or any party hereto, or any other act of insolvency of any of said parties however expressed or indicated, all of the aforesaid liabilities shall without notice, at the option of the said Bank, become immediately due without demand for payment thereof

The undersigned shall take all necessary steps to administer supervise preserve protect and realize upon all collateral but the said Bank or its assigns may, at their option collect, renew, extend compromise exchange sue for, or realize upon, any and all of said collateral, the said Bank, or assigns, shall in no event be liable or responsible to the makers or endorsers of or parties to this or any of said other obligations upon any claim of any kind or character, which they, or any of them, may seek to assert growing out of or connected with the dealing with or disposition by said Bank of any of said collaterals

The undersigned shall pay all expenses of any nature, whether incurred in or out of court, and whether incurred before or after this note shall become due at its maturity or otherwise, including, but not limited to, reasonable attorneys' fees and costs which may be necessary or proper in connection with the supervision, preservation, protection of, or realization upon, said collaterals The said Bank, or assigns, may, upon any default in any of the terms of this note by the undersigned, or the endorsers hereon, or the maturity (normal or accelerated) of any of the obligations of any of the makers, or endorsers secure by any provision hereof, or at any time after such maturity retain the proceeds of any checks, drafts, notes or acceptances which it or they may hold or have in process of collection for the account of the undersigned or endorsers hereon, or any of them, and may apply such proceeds together with any money on deposit with it or them, to the credit of the undersigned or endorsers hereon, or any of them, to the payment of this or any of said other obligations of the undersigned, or any of them, in the order, manner and proportions as it or they may elect

It is further agreed that upon any transfer of this note the said Bank may deliver the said collateral, or any part thereof, to the transferee, who shall thereupon become vested with all of the powers and rights hereinabove given to the said Bank in respect to said note and collateral, and the said Bank shall be thereafter forever relieved and fully discharged from any liability or responsibility in connection therewith Upon the discharge of this obligation said Bank shall have power to deliver the same with its collaterals to the order of any of the undersigned, or endorsers hereon, but shall also have the right to retain such of said collaterals as it, or they, may consider desirable to secure any one or more of said other obligations to said Bank just as if the said collateral so retained were specifically pledged therefor

If this obligation after default is placed in the hands of an attorney for collection, the maker(s) will be obligated to pay the holder hereof an additional sum as attorney's fee equal to ten per cent of the unpaid principal plus all accrued interest

If the insure named in any life insurance policy hypothecated as collateral for this note should die, the holder hereof may, at its option, declare the entire principal indebtedness then owing hereunder with all interest accrued thereon to be immediately due and payable

PHONE:  661-8044

500 South University, Suite A-24
Little Rock, Arkansas  72205        BY:

COMEX, INC.

Dwight L. Pierce, President

full payment on a debt owed to the debtor in bankruptcy, only to receive in return a minimal dividend on its claim owed to it by the debtor.

The Bankruptcy Reform Act carried into current practice the pre-Code concept of viewing a set off claim as a form of security interest recognized under state law. This approach is adopted from commercial practice and is particularly understandable when analyzing the Code's treatment of set off of bank deposits. Although retaining much of the pre-Code theory supporting the allowance of set offs, the Code shifts the analysis of set off rights from the field of preference law and places the controlling provisions in Bankruptcy Code Section 553.

Two forms of direct limitation on set offs are contained in § 553. In § 553(a), certain limitations regarding transfers of claims and the accrual of claims during the ninety (90) days preceding filing of the petition are outlined. The second limitation is contained in § 553(b) and concerns only the creditor's right to implement the set off during the ninety (90) days prior to bankruptcy. It provides that pre-petition set offs may be reduced and recovered by the trustee/debtor-in-possession to the extent that the creditor's position is improved within the ninety (90) day period over that which the creditor would receive in a Chapter 7 straight liquidation.

■ The Bankruptcy Code substantially changed former bankruptcy law by also allowing post petition set offs. The automatic stay provision contains a section enjoining the post petition set off of pre-petition claims except with the approval of the bankruptcy court. See, 11 U.S.C. § 362(a)(7). By inference, a clear implication exists that a creditor can utilize its set off remedy prior to bankruptcy without approval of a court. Thus, although stayed by § 362(a)(7), a creditor failing to set off prior to the commencement of a case does not lose the right of set off. See in this regard, *Terry v. Gordon's Jewelry Co. of Va., Inc.,* 7 B.R. 880, 882 (Bkrtcy.E.D.Va. 1980). See, also *In Re Fulghum Const.*

*Co.,* 23 B.R. 147, 153 (Bkrtcy.M.D.Tenn. 1982).

The framers of the Bankruptcy Code sought to provide a structure for review of a creditor's self-help right to exercise set off prior to bankruptcy. Set off post bankruptcy is prohibited absent court approval. The court will expand upon this Code provision later in this memorandum opinion in the context of the debtor's petition for contempt.

■ Both parties in the instant case, the debtor corporation and the bank, dedicated the vast majority of their arguments applying the facts in this case to the set off structure for review provided in the Bankruptcy Code. In this court's opinion, however, the argument is presented to no avail under the facts stipulated to and now before the court. This is so because in order to prevail in any court review of the set off procedures followed, there is a presumption that the deposits in question created the relationship of debtor and creditor between bank and depositor, which relationship would create the possibility of the right of set off. *United States v. Butterworth-Judson Corp.,* 267 U.S. 387, 394, 45 S.Ct. 338, 340, 69 L.Ed. 672 (1925). In such a case, there is mutuality of obligation out of which the bank's right of set off arises. This court does not find that such a relationship existed between these parties as to the subject deposits.

■ This court recognizes that there is an exception to the general rule outlined above. That is, in a situation where the bank has knowledge of a third person's interest in deposited funds, or notice of facts sufficient to put it upon inquiry as to the true character of the deposit, the debtor-creditor relationship is altered and the bank's right of set off is subject to the rights of such third party. See, *In Re Saugus General Hospital, Inc.,* 698 F.2d 42 (1st Cir.1983). See, also, *In Re Tonyan Construction Co., Inc., supra.*

The First Circuit Court of Appeals in the *Saugus* case, *supra,* dealt directly with the issue of whether a bank can exercise a set

off against a deposit which is known by it to be dedicated to a special use, citing *In Re Applied Logic Corp.*, 576 F.2d 952, 958 (2nd Cir.1978) and 4 Collier on Bankruptcy, Paragraph 68.16 at 912–13 (14th Ed. 1978). In the *Saugus* case, the bank argued that special deposits should be confined to cases in which the deposit is expressly or implicitly held in trust by the bank. The First Circuit yielded instead to the state law policy of preventing unduly burdensome effects on deposit or liquidity.

■ The facts in the instant case support a conclusion that the deposits in question represented special funds which would be outside the reach of the bank's set off rights. The parties entered into a specific agreement with respect to funds being sent to a specially arranged United States Postal Service lockbox. Receipts from the lockbox, to which the bank had exclusive access, were of only one type; patient payments on the debtor's subscriber (health care providers) accounts. The funds received from this lockbox were segregated for purposes of not only filing deposit slips but also recordation, microfilming and final processing. The bank, in fact, charged a special fee for "handling" each item in these specific deposits. In other words, Worthen made a special intermediate agent fee for handling these deposits outside the ordinary fee charged for general account banking transactions. The fact that the lockbox deposits were placed in a general deposit account does not, in this court's opinion, blur the distinct nature of these deposits. Like the First Circuit, this court has reviewed applicable state law policy in Arkansas regarding treatment of certain deposits which may be denominated as special. The Arkansas Supreme Court has acknowledged that there is an exception to the set off rule if money is placed in a bank

> for the purpose of safekeeping or on understanding that [the] bank shall act as bailee or deliver money under certain circumstances or to apply it to special purposes, or where [the] *deposit is made under circumstances such as to give rise to necessary implication that it was for such purposes,* [the] deposit is a special deposit and bank is merely agent or bailee with no right to use, dispose or permit disposition of deposit except pursuant to terms of agreement. *Lasley v. Bank of Northeast Arkansas, 4 Ark. App. 42, 627 S.W.2d 261 (1982). [emphasis supplied]*

The stipulation of facts submitted by the parties acknowledges that the parties knew the true nature of these deposits. The bank argues that the facts in the instant case are distinguishable from those in the *Tonyan* case, *supra,* in that the debtor is not specifically "seeking a constructive trust for the benefit of the doctors who were to be paid from lockbox deposits but rather seeks the funds to be returned ... for its own use." The bank also contends that even if the lockbox funds were denominated special funds from which to pay doctors who had rendered services, "such designation would now be meaningless because the doctors have already been paid in full by virtue of a bankruptcy court sale of the debtor's assets." The court rejects the bank's contentions. At best, they present a hindsight or afterthought approach to resolution of the ultimate issue—whether the bank could exercise its right of set off against the subject deposits.

The Arkansas Supreme Court stated pertinently in 1938:

> It is unquestionably the law that a general deposit of money in a bank passes the title to the bank and establishes the relation of debtor and creditor between the bank and the depositor, and because of this relation, the bank is bound by contract to honor the checks of the depositor to the extent of the deposits and becomes liable if it refuses to do so. No principle of law is better established. *Darragh Co., v. Goodman*, 124 Ark. 532, 187 S.W. 673; *England v. Hughes*, 141 Ark. 235, 217 S.W. 13; *Bank of Hatfield v. Chatham*, 160 Ark. 530, 255 S.W. 31. However there is an exception to this rule, that exception being that if the bank has notice that the funds, deposited do not belong to the depositor, it must dishonor a check drawn by the depositor on the

account in payment of his individual debts. If it does honor such checks with knowledge that the funds belong to others than the depositor it becomes liable to the rightful owner of the funds. Neither can the bank appropriate such funds in payment of a debt owing by the depositor to it. In other words, the usual right to set off as against an overdue note of the depositor so much of the deposit as is required to discharge the note does not exist.

Smith v. Security Bank and Trust Co., 196 Ark. 685, 119 S.W.2d 556, 561 (1938). See, also Lasley v. Bank of Northeast Arkansas, 4 Ark.App. 42, 627 S.W.2d 261, 263 (1982); Cherokee Carpet Mills, Inc. v. Worthen Bank and Trust Co., 262 Ark. 776, 561 S.W.2d 310 (1978); and Covey v. Cannon, 104 Ark. 550, 149 S.W. 514 (1912).[5]

The court has already discussed the effects of 11 U.S.C. § 362(a)(7) which section of the Bankruptcy Code prohibits any post petition set off of pre-petition claims except with the approval of the court upon seeking relief from the automatic stay. As pointed out earlier Worthen has not and is not now seeking relief from the automatic stay as to these funds. Because of the court's finding above, however,—that all lockbox deposits represent "special funds" —the court again concludes that it will not have to deal with whether the bank can exercise its right of set off against post bankruptcy filings. It cannot and for the same reasons outlined above with regard to pre-bankruptcy deposits. The issue then, with regard to post petition set offs by the bank is whether the bank is in contempt of court for violation of the automatic stay.

█ Technically the bank has violated § 362(a)(7) of the Bankruptcy Code which enjoins the post petition set off of pre petition claims except with the approval of the bankruptcy court. The debtor followed the correct procedure in filing a petition for contempt. This court, however, under the circumstances presented herein, is not inclined to find the bank in contempt. Its conduct, although improper, is not particularly egregious and is defensible. The bank continued to make the deposits to the debtor's account pursuant to the contractual lockbox agreement which was not terminated until May 18, 1983. The bank contends such procedure, absent a request for termination by the debtor, merely constituted a continuation of the ordinary course of business of the debtor. The court would agree, up to a point. Obviously the corresponding freezing of the accounts by the bank acted as a disruption of the debtor's ordinary course of business. The bank did, however, offer to deposit the funds in the registry of the court pending the outcome of this lawsuit. The court has considered all these factors and concludes that the bank should not be held in contempt.

The court has thus concluded that the bank could not exercise its right of set off as to these special deposits and the estate is entitled to recover all amounts representing the deposits the subject of this adversary proceeding, both pre and post bankruptcy in the amount of $84,897.54.[6]

5. The court feels the fact situation in the Cherokee Carpet Mills case is particularly noteworthy. There the depositor did business as a cattle auction sales and commission company and made an arrangement with the bank whereby he would deposit with the bank each day the total amount of money received by him for sales of cattle of others and the bank would cash all checks drawn on this account payable to the owners for the full sale price of their respective cattle, less the depositor's commission of 4%. These sales continued over a period of several months. The bank there appropriated the proceeds of the depositor's last cattle sale to the depositor's indebtedness to the bank, after a conference at which it was agreed that the bank would loan the depositor additional money and collect whatever the depositor owed the bank from the proceeds of this sale. In the meantime, the indebtedness of the depositor to the bank was increased by the bank's honoring checks drawn by the depositor to pay personal obligations. There the bank knew all along that the funds being deposited in this account were derived from sales of cattle that did not belong to its depositor and were trust funds and knew that the very funds it appropriated were of the same nature.

6. This amount represents a total of all deposits set off by the bank and stipulated to be the parties August 30, 1983. See note 3, supra.

Finally, although not pleaded in the debtor's Complaint, the parties have addressed in supplemental pleadings the merits of an action against the same creditor under 11 U.S.C. § 547(b). As such, it is part of this action by implied agreement. Bankruptcy Rule 7015, Federal Rules of Civil Procedure 15(b). The debtor seeks to avoid certain enumerated installment payments made pursuant to a June 21, 1982 loan agreement between the parties. The separate action alleging preferential transfers was included by the debtor in a supplemental pleading it filed some four months after the initial Complaint was filed. The debtor has never sought to amend its Complaint. Further, the defendant was placed in the difficult position of having to seek additional time to respond to the unanticipated allegation which constituted a new cause of action totally unrelated to the pending Complaint for turnover of accounts receivable.

The court, although recognizing that it has considerable discretion to allow amendments to Complaints or even to allow amendments to conform pleadings to the evidence, also finds that the facts underlying the new theory are too vaguely defined. The court cannot conclude, based upon the pleadings and evidence now before it, that the debtor has successfully met its burden in establishing avoidable preferences. *Constructora Maza, Inc. vs. Banco de Ponce*, 616 F.2d 573 (1st Cir.1980). The court reaches this conclusion even though the bank filed a responsive pleading and has not objected to the assertion of a new action absent an amended Complaint. Consequently, the court has decided to set the new cause of action for separate hearings on May 7, 1984, United States Courthouse, Little Rock, Arkansas, at 1:30 p.m.

Accordingly, for the foregoing reasons it is hereby

ORDERED that the debtor's Complaint for turnover of accounts receivable is granted pursuant to the findings of this court specifically set out in this opinion as to the subject bank deposits received both pre and post bankruptcy in the amount of $84,897.54. It is further

ORDERED that the debtor's petition for contempt is denied. It is further

ORDERED that a hearing be held on the separate issue of alleged voidable preferences on May 7, 1984, United States Courthouse, Little Rock, Arkansas, at 1:30 p.m.