See also, Bkrtcy., 82 B.R. 64.

In re BRITTENUM & ASSOCIATES, INC., Debtor.

James F. DOWDEN, Trustee, Plaintiff,

v.

CROSS COUNTY BANK, Jon R. Brittenum, Jana D. Brittenum, Melvyn L. Bell, Fred E. Halstead, Jerry Halstead, and Diana Halstead Jones, Defendants.

Bankruptcy No. AP 86–50M.
Adv. No. 86–155M.

United States Bankruptcy Court,
E.D. Arkansas, W.D.

Aug. 28, 1987.

James F. Dowden, Little Rock, Ark., Trustee.

Ken Cook, Little Rock, Ark., for Cross County Bank.

Richard D. Taylor, Little Rock, Ark., for Halstead, et al.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On January 30, 1986, the United States District Court for the Eastern District of Arkansas determined that the customers of Brittenum & Associates, Inc. (debtor) were in need of protection under the Securities Investor Protection Act of 1970 (SIPA). The Honorable James F. Dowden was appointed trustee by the district court, and the case was removed to the bankruptcy court for administration and liquidation pursuant to 15 U.S.C. § 78eee(b)(4).

At the beginning of the liquidation proceeding, the debtor owed the Cross County Bank (Bank) approximately $300,000 for a loan made by the Bank to the debtor on January 7, 1986. The loan was secured by a $300,000 certificate of deposit issued by the Bank on June 26, 1985, to "Jon R. Brittenum & Associates Special Reserve Account for the Exclusive Benefit of Customers." The trustee filed this complaint on March 10, 1986, and alleged that the Bank held no valid lien in the certificate of deposit.

This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), and the Court has jurisdiction to enter a final judgment. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule of Procedure 7052.

The essential facts in the case are as follows:

1. The Bank is a state chartered bank with its principal place of business in Wynne, Cross County, Arkansas.

2. Ken McClanahan (McClanahan) was serving as president of the Bank at all times relevant to this proceeding.

3. The debtor was a securities brokerage and investment banking firm with its principal place of business in Little Rock, Arkansas.

4. Jon R. Brittenum (Brittenum) was the president of the debtor at all times relevant to this proceeding.

5. On June 22, 1982, certificate of deposit number 6620 (CD 6620) was issued by the Bank to the debtor in the sum of $500,000. The maturity date of CD 6620 was June 22, 1985.

6. On August 14, 1984, a representative of the debtor added the following words to the face of CD 6620: "Special Reserve Account for the Exclusive Benefit of Customers."

7. On August 14, 1984, subsequent to the name change made on CD 6620, McClanahan initialed the certificate. On the same date a letter signed by Harry Ware was received by McClanahan.[1]

8. In May 1985, McClanahan was contacted by Beverly Sullivan, an employee of the debtor, who requested that CD 6620 be converted to a passbook savings account because the debtor needed access to the money. McClanahan advised her that if the CD was converted before the maturity date, the debtor would forfeit $32,000 in interest. McClanahan suggested that the Bank loan the debtor the face amount of the CD, and that the debtor pledge the CD as collateral and set the due date of the note on the same date as the maturity date of the CD. By structuring the loan in this fashion the loan could be paid with the CD proceeds, and the debtor would not forfeit the $32,000 interest.

9. The debtor executed a promissory note in favor of the Bank dated May 28, 1985, in the sum of $500,000, due on June 22, 1985. CD 6620 was pledged as collateral. The debtor received the loan proceeds in the amount of $500,000.

10. On May 28, 1985, a savings account was opened at the Bank by the debtor in the name of "Jon R. Brittenum & Associates, Inc. Special Reserve Account for the Exclusive Benefit of Customers." The account number was 01–494852–10, and the $500,000 loan proceeds were initially deposited into this account on May 28, 1985. A signature card for the savings account was signed by officers of the debtor on the same date.

11. A letter dated May 28, 1985, executed by McClanahan pertaining to the savings account was sent to the debtor.[2]

12. On June 22, 1985, CD 6620 matured in the amount of $500,000, and the proceeds were used by the debtor to satisfy the promissory note executed on May 28, 1985.

13. On June 26, 1985, certificate of deposit number 9545 (CD 9545) in the amount of $300,000 was issued by the Bank. CD 9545 was entitled "Jon R. Brittenum & Associates, Inc. Special Reserve Account for the Exclusive Benefit of Customers." CD 9545 was purchased with funds withdrawn from savings account 01–494852–10. After the withdrawal, $200,000 of the original deposit plus accrued interest remained in the savings account. The only explanation provided by the debtor to McClanahan of the significance of the special reserve

1. Harry L. Ware signed the letter, which was typed on the debtor's letterhead, as vice president of the debtor. The letter was addressed to McClanahan as president of the Bank and McClanahan acknowledged its receipt by signing at the bottom of the letter. The following language appeared in the letter:

> This letter is written in satisfaction of SEC Rule 15c3–3(f) concerning a Certificate of Deposit #6620 we have established with Cross County Bank. The following provisions of the Rule are hereby outlined in writing in accordance with paragraph (f) of the Rule:
> 1. The name of the certificate of deposit is to be entitled "Special Reserve Account for the Exclusive Benefit of Customers".
> 2. The certificate of deposit is to be held for exclusive benefit of customers of Brittenum & Associates, Inc. in accordance with the regulation of the Securities and Exchange Commission, and is to be kept separate from any other account maintained by this firm with the bank.
> 3. The certificate of deposit shall at no time be used as security for a loan to the firm by the bank and shall be subject to no right charge security interest, lien, or claim of any

kind in favor of the bank or any person claiming through the bank.
> 4. The bank may presume that any request for withdrawal from this account is in conformity and compliance with the rule.
> 5. The certificate of deposit may be redeemed upon demand during the course of normal banking hours.
> 6. Should the certificate of deposit be redeemed prior to its maturity the maximum penalty that would be charged is 6 months interest at 13%, or $32,500.
> You may indicate your understanding and acceptance of the above by signing both the original and copy of this letter and return the copy to me. If you should have any questions regarding this matter, please let me know. Thank you for your cooperation.

2. The letter was typed on the Bank's letterhead and was signed by McClanahan as president. The letter, which was addressed to Greg H. Culver, the debtor's compliance officer, contained virtually the same language that is contained in the introductory paragraph and provisions one through four of the letter set forth in footnote 1.

language was that it was required by the debtor's auditors. McClanahan did not inquire as to the meaning of the language.

14. On July 1, 1985, McClanahan, at Sullivan's request, signed a letter addressed to Brittenum, president of the debtor, pertaining to CD 9545. The content of the letter was prepared by an employee of the debtor and delivered to McClanahan for his signature.[3]

15. At the time the July 1, 1985, letter was signed by McClanahan, the debtor was not indebted to the Bank, and CD 9545 was not pledged as collateral.

16. On January 7, 1986, Brittenum, on behalf of the debtor, executed a promissory note (number 01–494852–61) payable to the Bank in the principal amount of $300,000, due on July 6, 1986. CD 9545 in the amount of $300,000 was pledged as collateral by virtue of a document entitled "Assignment of Certificate of Deposit Number 9545." The Bank also took possession of CD 9545. This loan transaction occurred at the request of the debtor and was presumed by the Bank to be a proper request. CD 9545 was turned over to the trustee without prejudice to the Bank's claim of lien.

## DISCUSSION

The trustee contends that CD 9545 and savings account 01–494852–10 are "Special Reserve Accounts," as provided in Rule 15c3–3 of the Securities and Exchange Act of 1934 (1934 Act), and therefore that they are special accounts which may not be pledged as collateral or subjected to the Bank's common law right of setoff.

The Bank claims that its loan to the debtor is properly secured by CD 9545; alternatively, the Bank claims a right of setoff against CD 9545 and the savings account. The Bank also argues that since there was no formal written contract between it and the debtor not to encumber CD 9545, the debtor did not conform to the requirements of Rule 15c3–3(f), and therefore the certificate of deposit is not a "Special Reserve Account." The Bank further argues that even if a "contract" existed, it was rescinded or modified by certain actions of the debtor.

The 1934 Act authorizes the Securities and Exchange Commission (SEC) to promulgate rules and regulations which affect the operations of security brokers and dealers. Pursuant to that authority, the SEC issued Rule 15c3–3, found in 17 C.F.R. § 240.15c3–3 (1987), pertaining to the protection and custody of customer securities. Rule 15c3–3(e), which requires that a broker or dealer maintain certain reserves in banks, states:

(e) *Special reserve bank account for the exclusive benefit of customers.* (1) Every broker or dealer shall maintain with a bank or banks at all times when deposits are required or hereinafter specified a "Special Reserve Bank Account for the Exclusive Benefit of Customers" (hereinafter referred to as the "Reserve Bank Account"), and it shall be separate from any other bank account of the broker or dealer. Such broker or dealer shall at all times maintain in such Reserve Bank Account, through deposits made therein, cash and/or qualified securities in an amount not less than the amount computed in accordance with the formula set forth in § 240.15c3–3a.

Rule 15c3–3(f) provides:

(f) *Notification of banks.* A broker or dealer required to maintain the reserve bank account prescribed by this section or who maintains a special account referred to in paragraph (k) of this section shall obtain and preserve in accordance with § 240.17a–4 written notification from each bank in which he has his reserve bank account or special account that the bank was informed that all cash and/or qualified securities deposited therein are being held by the bank for the exclusive benefit of customers of the broker or dealer in accordance with the regulations of the Commission, and are being kept separate from any other accounts maintained by the broker or

---

**3.** The letter contained virtually the same language as the letter set forth in footnote 1, except that there was no closing paragraph in the July 1, 1985, letter.

dealer with the bank, and the broker or dealer shall have a *written contract* with the bank which provides that the cash and/or qualified securities shall at no time be used directly or indirectly as security for a loan to the broker or dealer by the bank and, shall be subject to no right, charge, security interest, lien, or claim of any kind in favor of the bank or any person claiming through the bank. (emphasis added).

The Court is unaware of any case in which a court has construed the term "written contract" in the context of Rule 15c3–3(f), and the parties have referred to none. The obvious intent of Rule 15c3–3 is to require brokers and dealers to set aside a calculated percentage of their funds for the benefit of their customers. By complying with Rule 15c3–3(f), the broker/dealer informs the depository bank of the special nature of the funds.

The letters signed by the Bank's president and addressed to the debtor contained all of the information required by Rule 15c3–3(f). In the May 28, 1985, letter the Bank expressly agreed that savings account 01–494852–10 was to be established in accordance with the guidelines set forth in Rule 15c3–3(f), and the Bank agreed that the account could not be pledged as security for any loan by the Bank to the debtor. In the July 1, 1985, letter the Bank agreed to the same conditions after the debtor withdrew $300,000 from the savings account on June 26, 1985, and purchased certificate of deposit 9545. Both the savings account and CD 9545 were established in the name of "Jon R. Brittenum & Associates, Inc. Special Reserve Account for the Exclusive Benefit of Customers." The trustee's expert witness testified that in his experience with broker liquidations, he had never seen any formal "written contracts" as the term is used in Rule 15c3–3(f), and that the only documents he had seen evidencing reserve accounts were substantially the same as the letters signed by McClanahan. The Bank presented no evidence to controvert the debtor's expert witness.

 The Bank's argument that it was unaware of the implications of the letters and thus never agreed to their content because they were drafted by the debtor and not properly explained to the Bank, is without merit. The Bank's agent who signed the letters was the Bank's president, not a less experienced bank officer. Although McClanahan may not have been knowledgeable of securities law or of the technical requirements of Rule 15c3–3(f), he certainly had the opportunity and the responsibility to learn the ramifications of the transactions in question. There was no language in the letters which could have deceived McClanahan. The letters' content was clear; the Bank was to hold the funds for the benefit of customers of the debtor and these funds were not to be used as collateral for a loan.

The evidence establishes that the debtor entered into an agreement with the Bank, in which the Bank agreed to hold the funds pursuant to Rule 15c3–3. The letters signed by McClanahan acknowledged the Bank's understanding of the agreement and satisfied the notification requirements of Rule 15c3–3(f). Therefore, savings account 01–494852–10 and CD 9545 were special reserve accounts at the commencement of the liquidation proceedings.

 The Bank argues that even if an agreement existed not to use CD 9545 as collateral, the debtor rescinded or modified the agreement because the debtor was the party who requested the loan from the Bank and suggested that CD 9545 be used as collateral. The Court is unpersuaded by this argument. The account specified that the funds were maintained for the "exclusive benefit of customers." The Bank was on notice that the CD was not to be used as collateral for a loan to the debtor. Although both parties acknowledge that under the agreement the Bank was allowed to presume that "any request for withdrawal ... is in conformity with" Rule 15c3–3(f), this language cannot be interpreted to excuse the Bank for accepting the certificate of deposit as collateral, in direct contravention of the terms of the same letter. There was no evidence that the Bank took any action to determine whether its agreement not to accept the certificate of deposit as

collateral was still in effect after the debtor suggested the loan transaction. The Bank cannot claim that its agreement not to use the CD as collateral for a loan has been rescinded simply because the debtor requested the very transaction which is prohibited by the agreement. Such a request does not change the fact that the funds were held by the debtor for the benefit of its customers in accordance with Rule 15c3–3.

■ The Bank's final argument is that it may properly exercise its right of setoff against either the funds in the savings account or CD 9545. 11 U.S.C. § 553 specifically recognizes the validity of the right of setoff in bankruptcy cases. Normally, when funds are deposited with a bank, the funds are general deposits and a debtor-creditor relationship is created between the bank and the depositor. *In re Multiponics, Inc.*, 622 F.2d 725 (5th Cir.1980). In such a relationship, the bank has the right of setoff against the funds for debts owed to the bank by the depositor. However, this relationship does not exist when the funds on deposit are held in a special account or impressed with a trust. *In re Multiponics, Inc.*, 622 F.2d at 728. There is no right to setoff if funds are established as special accounts or in trust for a special purpose. *In re Texas Mortgage Services Corp.*, 761 F.2d 1068 (5th Cir.1985); *Bridgeport Co. v. U.S. Postal Service*, 39 B.R. 118 (Bankr.E.D.Ark.1984). In order to qualify the funds as special accounts or funds held in trust, the bank must be made aware that the deposit is for a special purpose. *United States v. Butterworth–Judson Corp.*, 267 U.S. 387, 394–95, 45 S.Ct. 338, 340, 69 L.Ed. 672 (1925) ("[A] bank having notice that a deposit is held by one for the use of or as security for another has only such right of setoff as is not inconsistent with the rights of the latter."); *White v. Pacific Southwest Trust & Savings Bank*, 9 F.2d 650, 659 (S.D.Cal.1925) ("[W]here there is no notice to the bank of its 'trust' character, there [is] a presumption that deposits are general, and not special or trust.").

The Bank was clearly on notice of the nature of CD 9545 and savings account 01–494852–10. The account names specified that funds were being held for a special purpose, and the letters signed by the Bank's president unequivocally stated that the funds were not to be commingled with any other funds of the debtor held by the Bank. The Bank agreed to hold the funds for a special purpose, and the establishment of the accounts did not create a debtor-creditor relationship. *See In re Multiponics, Inc.*, 622 F.2d at 728; *In re Goodson Steel Corp.*, 488 F.2d 776, 779 (5th Cir.1974). Therefore, the Bank does not have a right of setoff against the savings account or CD 9545.

Certificate of deposit number 9545 and savings account 01–494852–10 are determined to be property of the estate free and clear of any claim of lien or right of setoff by Cross County Bank.

IT IS SO ORDERED.